UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WILLIAM NUGENT, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No.: 2:09-CV-00601-GMN-RJJ |
| ) | |
| LAS VEGAS METRO POLICE ) | **ORDER** |
| DEPARTMENT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case arises out of injuries Plaintiff sustained when police officers restrained him in jail.  Before the Court is Defendant's Motion for Summary Judgment (ECF No. 23).  For the reasons that follow, the Court GRANTS the motion as to the claims arising under 42 U.S.C. § 1983; DISMISSES, without prejudice, Plaintiff's state law claims; and DENIES, as moot, Defendant's Motion for Summary Judgment as to the state law claims.

**I.     FACTS AND PROCEDURAL HISTORY**

Just before midnight on February 17, 2009, Plaintiff William Nugent was arrested by Officers K. Stoll and T. Howard, employees of Defendant Las Vegas Metropolitan Police Department ("LVMPD"), and was taken to the Clark County Detention Center ("CCDC") for booking. (Compl. ¶ 6, Ex. A, ECF No. 1.)  Plaintiff was arrested for carrying a concealed weapon and possession of marijuana.  Plaintiff carries the weapon for protection--although he admits he has no permit to carry it concealed and usually keeps it in his truck legally--because, as the owner of a late-night parking lot sweeping business, he has been harassed by vagrants many times, including the night of the arrest.  (Nugent Dep. 20–21, Nov. 10, 2009, ECF No. 23-1.)  Plaintiff does not dispute the

legality of his arrest in the present case but complains about a beating he allegedly received by eight officers while in custody in the CCDC. (Compl. ¶¶ 7–8.) Plaintiff alleges that he was "wrongfully attacked, physically assaulted, hit, battered, and/or otherwise severely injured." (*Id.* ¶ 7.)

Defendant alleges that the officers reasonably restrained Plaintiff after he became noncompliant during booking at a point in time when his hands were unrestrained. (Mot. for Summ. J. 3–4, ECF No. 23.) Defendants attach an authenticated video of the incident. (*See* Mot. for Summ. J., Ex. C; Aff., ECF No. 24.)

Defendant explains the incident as follows. Hardy had removed Nugent's handcuffs so that he could take off his coveralls for Hardy to complete the search. When Nugent threw the coveralls to the ground, Hardy told him to pick them up. Nugent testified in his deposition that Hardy said, "you pick up that mother fucking shit now," to which Nugent admits he responded, "you pick up that shit yourself" or "you pick up that mother fucking shit yourself." (Nugent Dep. 38:20–24.) Based on this vulgar display of noncompliance, the fact that Hardy had not completed his search of Nugent (who had already been arrested for having one concealed weapon on his person), and the fact that Nugent was larger than Hardy, Hardy made a "split second judgment call" to use a takedown maneuver to get Nugent back in restraints. (Mot. for Summ. J. 4:6–13.) As Defendant notes, none of the officers strike Nugent in the video. The object that was placed over Nugent's head near the end of the video was a "spit hood." (*Id.* at 4:21–22.) While in custody, Nugent complained only of wrist pain from the handcuffs while he was in the chair, and he was treated by a nurse; he did not complain of any other injuries and refused any medication. (*Id.* at 5:2–10.)

After visiting an attorney, who referred him to a doctor, Nugent alleged that officers had thrown him against a wall, knocked him to the ground, and subsequently

kicked and beaten him while his wrist was bent back for restraint, and that several fillings were knocked from his mouth. (*Id.*, Ex. G.)  Defendants note that the video evidence contradicts these claims and that Nugent admitted under oath that he had no fillings in his mouth prior to the incident. (Nugent Dep. 70:8–21.)  However, elsewhere in his deposition, Nugent claims that three teeth were "cracked immediately" upon being thrown to the ground, although he did not realize it until after he was released, (*id.* at 42:20–24), and the language of Nugent's testimony about never having had fillings as an adult does not negate his testimony that his teeth were cracked during the incident. Nugent testified that the dentist he saw said he had cracked teeth, and that he had never had any dental work on those teeth. (*Id.* at 3–10.)  Because the M.D. who examined Nugent, Dr. Michael D. DiGregorio, is not a D.D.S., it is possible he saw cracked teeth and noted them as fillings that had been knocked loose. (*See* Mot. for Summ. J., Ex. G.) It is also possible that fillings from Nugent's childhood were loosened.  Taken together, this means that there is a question of fact as to whether Nugent's teeth were cracked or fillings were loosened during the incident.

Nugent sued LVMPD and eight Doe defendants in the Clark County District Court on five causes of action: (1) Negligence; (2) Negligent Supervision; (3) Intentional Infliction of Emotional Distress ("IIED"); (4) Battery; and (5) Violations of the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983.  Defendant removed to this Court and has now moved for summary judgment on all causes of action.

II.     **SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material

facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the

opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

**III.   ANALYSIS**

    **A.   42 U.S.C. § 1983**

The Eleventh Amendment prohibits suits against states in federal court without their consent. In a parallel but independent analysis, 42 U.S.C. § 1983 only creates jurisdiction for suits against "persons." Neither a state nor its employees acting in their official capacities are "person[s]" who can be sued under § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989), but state employees may be sued in their individual

capacities as "persons" under § 1983, *Hafer v. Melo*, 502 U.S. 21, 27 (1991). State employees sued in their individual capacities for injunctive relief or for damages to be paid out of their private resources are not protected by a state's Eleventh Amendment immunity. *Edelman v. Jordan*, 415 U.S. 651, 664–65 (1974); *Ex parte Young*, 209 U.S. 123, 159–60 (1908). Officers of LVMPD are not employees of the State of Nevada but of a municipality, LVMPD, and they may therefore be sued in their individual or official capacities under § 1983. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). At present, no individual officers are joined as defendants in this case. Only LVMPD is named as a defendant. Although police departments are not generally "persons" under § 1983, *United States v. Kama*, 394 F.3d 1236, 1239–40 (9th Cir. 2005), inter-governmental agencies are "persons" under § 1983 if the parties that created the agency "intended to create a separate legal entity subject to suit," *Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995). LVMPD is therefore itself a "municipality" subject to suit under § 1983 if it was intended to be a separate legal entity from the City of Las Vegas and the County of Clark, which created LVMPD as a common police force. The statute providing for the merger of city and county law enforcement agencies makes clear that the Nevada Legislature did not intend for such mergers to consist of mere cooperation agreements, but intended to create legal entities independent from the respective cities and counties. *See* Nev. Rev. Stat. § 280.120 (1973) (providing for complete supersession of former law enforcement agencies with the newly created agencies). Nevada's merger statute provides a means of merging city and county law enforcement agencies analogous to the merger of two corporations. *See* Nev. Rev. Stat. §§ 280.105–280.123. The identities of the former agencies are completely subsumed by the identity of the new agency. Nev. Rev. Stat. § 280.120. LVMPD may therefore be independently sued under § 1983. *See Estes*, 65 F.3d at 792.

In order to hold a municipality liable under *Monell* for declaratory, injunctive, or monetary relief, the allegedly unconstitutional actions must have been pursuant to an official municipal policy, ordinance, regulation, or officially adopted decision. *Id.* at 690–91. The Ninth Circuit has explained:

> In a *Monell* claim, there are three ways to show a policy or custom of a municipality: (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008) (citations and internal quotation marks omitted). Prospective injunctive relief may be had against a municipality's enforcement of an allegedly unconstitutional state policy even if the municipality itself has only adopted the policy through enforcement. *Chaloux v. Killeen*, 866 F.2d 247, 250–51 (9th Cir. 1989). In any case, "[l]iability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983." *Id.*

Additionally, individuals in their private capacities--but not municipalities or individuals in their official capacities--enjoy qualified immunity against claims of constitutional violations where the right alleged to have been violated was not clearly established at the time of the alleged violation. *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993) (citing *Owen v. City of Independence*, 445 U.S. 662, 638

(1980)). Under *Saucier v. Katz*, a district court uses a two-step procedure to determine whether an official is entitled to qualified immunity: (1) the court asks whether there has been a constitutional violation; and (2) if so, the court asks whether the state of the law at the time of the alleged violation was clear such that a reasonable person in the defendant's position should have known his actions violated the plaintiff's rights. 533 U.S. 194, 201 (2001). Under *Pearson v. Callahan*, it is within the sound discretion of a district court which *Saucier* step to employ first; the court may examine the second step first in order to avoid constitutional holdings where a defendant will be free from liability due to qualified immunity in any case. 129 S. Ct. 808, 818 (2009).

Here, Plaintiff makes a conclusory allegation in the complaint that the acts complained of were pursuant to a custom, practice, or policy of the LVMPD. (Compl. ¶ 31.) But even assuming--against the evidence in the video--that the events occurred as Plaintiff claims, there is no evidence in the record indicating a custom, practice, policy, ordinance, regulation, or officially adopted decision to tackle detainees who simply refuse commands during a search, without attempting to handcuff them first, or to beat detainees once they are restrained on the ground. In fact, Lt. Butler's report indicates that Hardy's actions were contrary to LVMPD policy.[1] Officer Hardy's eleven weeks of training as a corrections officer and his further training as a defensive tactics instructor, (Hardy Dep. 12–15), negate a failure-to-train claim under *City of Canton v. Harris*, 489 U.S. 378 (1989). When asked in Interrogatory No. 18 to specifically identify any such

---

[1] Lt. Darrick Butler's report recounts the incident consistently with Hardy's description of it and indicates that according to a review of the incident and Department Policy 6/002.00 USE OF FORCE, "Officer Hardy's decision to use force was premature." (Resp., Ex. 2 at 2–3, ECF No. 27-2.) Lt. Butler concluded that Hardy's use of force was not meant to punish or cause undo discomfort, but to de-escalate the situation, and that Hardy had no history of violating the relevant policy. (*Id.* at 3) Still, it was a "lapse in judgment." (*Id.* at 4) In summary, this indicates that Officer Hardy acted contrary to a policy of the LVMPD, meaning that, in the absence of any custom to violate the policy in this way, there is no *Monell* liability for LVMPD. But this also means that Hardy's actions do not fall within the scope of discretionary immunity as against certain state law claims, as addressed, *infra*.
   Lt. Butler did, however, find the use of the restraint chair proper, as he found that Nugent became combative once on the ground by grabbing Officer Cortes' hand. (*Id.*)

customs or policies or facts that support the claim that they exist, Plaintiff responded "Overall, the LVMPD has policies in place which address the topic of 'use of force' on inmates. I don't know the name of the document that sets forth these policies, however, I believe the officers at the CCDC are supposed to be properly trained . . . ." (Resp., Ex. 1 at 8:15–9:1, ECF No. 27-1.) Plaintiff goes on to state, "it is clear that if these [use-of-force] policies exist, they were not followed by the officers or they were deliberately disregarded." (*Id.* at 9:2–4.) Although this, if true, supports a lack of discretionary immunity, it does not support a *Monell* or *Canton* claim against LVMPD. Defendant LVMPD is entitled to summary judgment on the *Monell* and *Canton* claims. Defendant has carried its initial burden of negating any policy or custom of improper use of force or failure to train and Plaintiff has not carried his shifted burden of showing a genuine issue of material fact on these points. The Court need not determine whether any individual officers are potentially liable under section 1983, because none of them have been joined as defendants.

### B. State Law Claims

In cases that are properly in federal court based on federal question jurisdiction, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); 28 U.S.C. § 1367(c)(3). The rationale underlying this principle is that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Id.*

Federal courts are not, however, required to dismiss the state law claims after dismissing all of the federal claims; the decision to dismiss the state law claims is left to the court's discretion. *Acri v. Varian associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997).

In reaching such a decision, the court must first identify the dismissal that triggers the exercise of discretion and then explain "how declining jurisdiction serves the objectives of economy, convenience and fairness to the parties, and comity." *Trustees of Construction Industry and Laborers Health and Welfare Trust v. Desert Valley Landscape & Maintenance, Inc.*, 333 F.3d 923, 925 (9th Cir. 2003).

Here, the Court has dismissed all of Plaintiff's claims arising under 42 U.S.C. § 1983, which served as the only basis for the Court's federal question jurisdiction in this case. The parties are not diverse, so there can be no diversity jurisdiction. Accordingly, 28 U.S.C. § 1367(c)(3) applies, as the Court has dismissed all claims over which it has original jurisdiction.

The Court must now turn to whether exercising its discretion under section 1367(c) would be in the interest of economy, convenience and fairness to the parties, and comity. Dismissing the state law claims without prejudice and allowing Plaintiff to re-file them in state court would clearly serve the objectives of comity and fairness to the parties, as this would allow the claims to be heard in the forum that is the most competent to resolve them and would prevent this Court from flouting the doctrine of federalism. Although the state law claims seem fairly unremarkable on their face, their resolution will depend on interpreting Nevada's discretionary immunity statute--Nev. Rev. Stat. § 41.032--and making determinations such as whether, under Nevada law, a police department can be held liable, under a theory of *respondeat superior*, for the actions of an officer that exceed the protections of the discretionary immunity statute. Such questions are best left for the state court to decide, not only because of their expertise in that sphere of law, but also because--pursuant to the doctrines of comity and federalism--although federal courts may be obliged to speak on questions of state law in certain circumstances, absent a strong justification, state law questions belong in state court.

Although, from the perspective of the parties, exercising its discretion to dismiss the state law claims may not seem to be the most economical and convenient route for the Court to take, it will not impose an undue burden on the parties: the date scheduled for trial is still over one month away and the Court's treatment of this issue *sua sponte* will almost certainly preempt filings on the matter that would have delayed the trial date. Further, the proceedings in state court should be able to proceed quickly and smoothly now that the parties have prepared their pleadings and motions. Based on these reasons and viewing them in light of the Supreme Court's instruction in *Giles* that state law claims "should" be dismissed if all federal claims are dismissed before trial, this Court finds that the objectives of economy and convenience would not be sufficiently frustrated by its decision to dismiss the state law claims to prevent it from doing so. Accordingly, the Court dismisses Plaintiff's state law claims without prejudice.

## CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (ECF No. 23) is GRANTED as to the claims arising under 42 U.S.C. § 1983, and Plaintiff's state law claims are DISMISSED without prejudice. Defendant's Motion for Summary Judgment is therefore DENIED, as moot, with regard to the state law claims.

DATED this 22nd day of September, 2010.

_____
Gloria M. Navarro
United States District Judge